ORIGINAL

FILED
FEB - 6 2004
U.S. COURT OF
FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

WASHINGTON OFFICE CENTER L.L.C.,

*Plaintiff,*

v.

UNITED STATES OF AMERICA,

*Defendant.*

No. 04- 165C

## COMPLAINT

### Introduction

1. Since 1990, the government has leased from plaintiff approximately 200,000 square feet of office space at 409 Third Street, S.W., in Washington, D.C. The government uses the space to house the Small Business Administration. Under the lease agreement, the government each year must pay the plaintiff (1) "fixed rent" [1] and (2) an "operating cost adjustment" that varies with inflation as measured by the consumer price index.[2] During the first ten years of the lease, the government paid the entire rent due.

2. In 2000, after the government exercised its option to renew the lease, the government unilaterally changed its rent calculation method and began underpaying the plaintiff by

[1] "Fixed rent" is the base amount of rent due in each calendar year. The parties' lease agreement set fixed rent at $30.00 per net usable square foot ("NUSF") per year for the initial lease term and $39.50 per NUSF per year for the renewal lease term. Under the lease agreement, fixed rent includes "a 'net' price per square foot for rental and a 'base' price per square foot for services and utilities (operating expenses) to be provided by the Lessor."

[2] The "operating cost adjustment" for a particular year represents the change (due to inflation or deflation since the lease's first year) in the landlord's cost of services and utilities (as negotiated and agreed upon by the parties) in the lease term's first year.

$378,662.49 each year. The parties had not agreed to, nor discussed, changing the rent calculation method during the renewal term.

3. The lease, as amended for the renewal period, requires that rent continue to be calculated as it was calculated during the initial lease term. The government's underpayments in 2000, 2001, 2002, 2003, and 2004 constituted breaches of contract, and plaintiff is entitled to damages in the amount of the underpayments, plus prejudgment interest.

**Parties**

4. Washington Office Center L.L.C., is a Delaware limited liability company with its principal place of business in Washington, D.C. Washington Office Center L.L.C. is successor in interest to WDC Associates Limited Partnership. For purposes of this Complaint, both Washington Office Center L.L.C. and WDC Associates Limited Partnership are referred to as "WOC" or "plaintiff."

5. Defendant is the United States of America acting through the General Services Administration. For purposes of this Complaint, both the United States of America and the General Services Administration are referred to as "the government."

6. This matter arises under lease no. GS-11B-90303 (previously known as lease no. GS-11B-90210), which WOC and the government executed on November 8, 1989, and renewed on April 24, 2000.

## Jurisdiction

7. The lease is subject to the Contract Disputes Act of 1978, as amended.

8. On February 24, 2003, the government, acting through its Contracting Officer Robert Reed, issued a final decision denying WOC's certified claim.

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1491 (1994) and 41 U.S.C. §§ 601-613 (1994).

## FACTS

### The Government's Solicitation for Offers

10. In late 1988, the government issued Solicitation for Offers ("SFO") No. 89-014 for a lease of 197,040-204,300 net usable square feet of office and related space in downtown Washington, D.C., to house the Small Business Administration. The SFO required offerors to offer a ten-year, firm-term lease with a ten-year renewal option.

11. The SFO required offerors to offer rent prices consisting of two components: "fixed rent" and "operating cost adjustments." The total rent due each year after the first year would be the sum of (1) the fixed rent and (2) the operating cost adjustment for that year. The first component of rent, fixed rent, would not vary with inflation or deflation from year to year during the lease term. The second component, operating cost adjustments, would vary from year to year with inflation or deflation.

12. The SFO required that the first component, fixed rent, include both a "'net' price per square foot for rental and a 'base' price per square foot for services and utilities (operating expenses) to be provided by the Lessor."

13. The SFO required that the second component, the operating cost adjustment, represent the change (due to inflation or deflation since the lease's first year) in the annual cost

of services and utilities for the premises. In the SFO's words, the annual operating cost adjustment is "for changes in costs for cleaning services, supplies, materials, maintenance, trash removal, landscaping, water, sewer charges, heating, electricity, and certain administrative expenses attributable to occupancy" over those services' cost (as agreed upon by the parties) in the lease's first year (the "base year.").

14. The SFO required that the operating cost adjustment for a particular year "be determined by multiplying the base rate"—the operating expenses as agreed upon by the parties for the base year—"by the percent of change in the cost of living index." The SFO required that

> the percent change . . . be computed by comparing the index figure published for the month prior to the lease commencement date with the index figure published for the month which begins each successive 12-month period. For example, a lease which commences in June of 1985 would use the index published for May of 1985 and that figure would be compared with the index published for May of 1986, May of 1987, and so on, to determine the percent change.

15. The SFO required that payment of the annual operating cost adjustment "be made with the monthly installment of fixed rent."

16. The SFO required that offerors offer prices that would be calculated by the same method (adding a particular year's operating cost adjustment to the fixed rent) in both the initial ten-year lease term and the renewal lease term.

17. The SFO required that during the renewal term rent continue (as in the initial lease term) to include all of the increase in operating cost since the base year.

18. The SFO did not provide that the increase in operating cost during the initial ten-year lease term would be subtracted from the government's rent obligation during each year of the renewal term.

19. The SFO required that "[i]f the offer includes annual adjustments in operating expenses, the base price from which adjustments are made will be the base price for the term of the lease, including any option periods."

**WOC's Offer and the Government's Acceptance**

20. WOC submitted an offer conforming to the SFO. WOC offered the government a ten-year, firm-term lease of space at 300 D Street, S.W., in Washington, D.C., for fixed rent in the amount of $30.00 per net usable square foot ("NUSF") per year, plus annual operating cost and tax adjustments. In response to the SFO's requirements, WOC also offered the government a ten-year renewal option for fixed rent in the amount of $39.50 per NUSF per year, plus continuing annual operating cost and tax adjustments. WOC's written offer (which the government accepted) stated that the $39.50 fixed rent price for the renewal term "exclud[ed] escalation."

21. The government evaluated WOC's offer according to evaluation criteria under which rent during any renewal term would continue to comprise (1) fixed rent and (2) operating cost adjustments. Under the evaluation criteria, rent during the renewal term would continue (as in the initial lease term) to include all of the increase in operating cost since the base year.

22. The government evaluated WOC's offer according to evaluation criteria under which the increase in operating cost during the initial lease term would not be subtracted from the government's rent obligation during each year of the renewal term.

23. The government evaluated WOC's offer according to evaluation criteria under which rent during any renewal term would comprise (1) fixed rent of $39.50 per NUSF and (2) operating cost adjustments. Under the evaluation criteria, rent during the renewal term would

continue (as in the initial lease term) to include all of the increase in operating cost since the base year.

24. During negotiations in 1988 and 1989, no representative of either party ever discussed or agreed that during the renewal term the government would pay rent that did not include all of the increase in operating cost since the base year. Nor did anyone discuss or agree that the increase in operating cost during the initial lease term would be subtracted from the government's rent obligation during each year of the renewal term.

25. The government accepted WOC's offer.

**The Lease Terms**

26. On November 8, 1989, WOC and the government executed a lease agreement. The lease agreement provided for a ten-year lease for fixed rent in the amount of $6,129,000 (or $30.00 per NUSF) per year, plus annual operating cost and tax adjustments. It also provided for a ten-year renewal option for fixed rent in the amount of $8,069,850 (or $39.50 per NUSF) per year, plus continuing annual operating cost and tax adjustments.

27. The government drafted the lease.

28. The lease incorporated the SFO by reference, stating "The following are attached and made a part hereof: (A) Solicitation for Offers No. 89-014 . . . ."

29. The lease provided that the government could renew the lease for (1) fixed rent of $8,069,850 ($39.50 per NUSF) and (2) operating cost adjustments. Rent during the renewal term would continue (as in the initial lease term) to include all of the increase in operating cost since the base year.

30. The lease provided:

> This lease may be renewed at the option of the Government, for the following terms and at the following rentals: One ten (10) year

> renewal option at an annual rental of $8,069,850 at the rate of $672,487.50 per month in arrears, in addition to continuing tax and operating escalations.

(emphasis added).

31. The lease further provided in Rider I that "[t]here will be a renewal option of ten years at the rate of $39.50 per net usable square foot."

32. The lease did not provide that the increase in operating cost during the initial lease term would be subtracted from the government's rent obligation during each year of the renewal term.

33. In the early 1990s, the parties on two occasions amended the lease to add square footage and lessor-provided cleaning services. On each occasion, the parties increased fixed rent to reflect the change.

34. On the second occasion, memorialized in Supplemental Lease Agreement No. 5 (dated March 17, 1992), the parties increased fixed rent "to reflect the addition of 3,399 net usable square feet . . . and to reflect the addition of daytime cleaning services" costing $12,130. The parties in Supplemental Lease Agreement No. 5 agreed that the fixed rent for the renewal period would increase to $8,803,092, an amount equal to $39.50 per NUSF multiplied by 222,556 net usable square feet plus another $12,130 for the added cleaning services.

## The Government's Performance During the Initial Lease Term

35. In each year of the initial lease term (November 24, 1990-November 23, 2000), the government paid WOC the full amount it was due. The government paid WOC amounts equal to (1) fixed rent and (2) operating cost adjustments. In each year of the initial lease term, the government paid rent that included all of the increase in operating cost since the base year (1990).

## The Government Exercises The Renewal Option

36. In late 1999 and early 2000, the government and WOC negotiated the government's renewal of the lease. During negotiations, no representative of either party ever discussed or agreed to changing the basic payment formula (under which the government paid fixed rent plus operating cost adjustments) used during the initial lease term. Neither party discussed or agreed that during the renewal term the government would pay rent that did not include all of the increase in operating cost since the base year.

37. The government exercised the renewal option on April 24, 2000.

38. Under the renewal terms, the government each year of the renewal period must pay fixed rent of $8,803,092 plus operating cost adjustments. The $8,803,092 fixed rent amount had been set by the parties in 1992 in Supplemental Lease Agreement No. 5. The $8,803,092 amount represents a price of $39.50 per NUSF for 222,556 net usable square feet, plus $12,130 for additional cleaning services. The $8,803,092 amount does not include the increase in operating cost during the initial lease term.

39. Supplemental Lease Agreement No. 29 (dated April 24, 2000), by which the government exercised the renewal option, provides for "annual rent for the leased premises of $8,803,092.00 payable at the rate of $733,591.00 per month in arrears in addition to continuing operating expense and real estate tax escalations." (emphasis added).

40. Supplemental Lease Agreement No. 29 provides that the "base year for . . . base operating costs . . . shall remain unchanged."

41. Supplemental Lease Agreement No. 29 further provides that "[a]ll other terms and conditions of the lease shall remain in force and effect."

42. Supplemental Lease Agreement No. 29 does not provide that rent will be calculated differently in the renewal term than it was in the initial lease term (except that fixed rent would increase to $8,803,092, the fixed rent renewal price the parties set in 1992).

43. Supplemental Lease Agreement No. 29 does not provide that the government may pay less than all of the increase in operating cost since the base year.

44. Supplemental Lease Agreement No. 29 does not provide that the increase in operating cost during the initial lease term should be subtracted from the government's rent obligation during each year of the renewal term.

45. The parties' representatives never discussed nor agreed, either orally or in writing, that rent would be calculated differently in the renewal term than it was in the initial lease term (except that fixed rent would increase to $8,803,092).

46. The parties' representatives never discussed nor agreed, either orally or in writing, that the government would pay less than all of the increase in operating cost since the base year.

47. The parties' representatives never discussed nor agreed, orally or in writing, that the increase in operating cost during the initial lease term would be subtracted from the government's rent obligation during each year of the renewal term.

**<u>The Government's Underpayment of Rent in the Renewal Term</u>**

48. For the first year of the renewal period (November 24, 2000-November 23, 2001), the lease required the government to pay fixed rent of $8,803,092 plus an operating cost adjustment. The government properly calculated the operating cost adjustment as $442,726.24 (the base operating cost of $1,508,930 multiplied by the 29.34% increase in the consumer price index from October 1990 to October 2000). The government then subtracted from the operating cost adjustment $378,662.49—an amount equal to the entire operating cost increase from October

1990 to October 1999. The government's unilateral subtraction of $378,662.49 from its rent payments that year was not authorized by the original lease agreement or by Supplemental Lease Agreement No. 29. Indeed, it was contrary to both.

49. As a result of the government's subtraction, the government underpaid the rent due that year by $378,662.49.

50. For the second year of the renewal period (November 24, 2001-November 23, 2002), the government properly calculated the operating cost adjustment to be $481,622.08 (the base operating cost of $1,508,930 multiplied by the 31.918% increase in the consumer price index from October 1990 to October 2001). The government then again subtracted from the operating cost adjustment $378,662.49—an amount equal to the entire operating cost increase from October 1990 to October 1999. The government's unilateral subtraction of $378,662.49 from its rent payments that year was not authorized by the original lease agreement or by Supplemental Lease Agreement No. 29. Indeed, it was contrary to both.

51. As a result of the government's subtraction, the government underpaid the rent due that year by $378,662.49.

52. For the third year of the renewal period (November 24, 2002-November 23, 2003), the government properly calculated the operating cost adjustment to be $519,373.93 (the base operating cost of $1,508,930 multiplied by the 34.42% increase in the consumer price index from October 1990 to October 2003). The government then again subtracted from the operating cost adjustment $378,662.49. The government's unilateral subtraction of $378,662.49 from its rent payments that year was not authorized by the original lease agreement or by Supplemental Lease Agreement No. 29. Indeed, it was contrary to both.

53. As a result of the government's subtraction, the government underpaid the rent due that year by $378,662.49.

54. For the fourth year of the renewal period (November 24, 2003-November 23, 2004), the government properly calculated the operating cost adjustment to be $558,269.78 (the base operating cost of $1,508,930 multiplied by the 36.998% increase in the consumer price index from October 1990 to October 2003). The government then again subtracted from the operating cost adjustment $378,662.49. The government's unilateral subtraction of $378,662.49 from its rent calculation was not authorized by the original lease agreement or by Supplemental Lease Agreement No. 29. Indeed, it was contrary to both.

55. As a result of the government's subtraction, the government will underpay by $378,662.49 the rent due in the lease year that began November 24, 2003. As of the date of this Complaint, the government has underpaid the rent by $94,665.62 since November 24, 2003.

56. The government's underpayments of rent due in 2000, 2001, 2002, 2003, and 2004 indicate that the government will continue underpaying the rent due in 2004, 2005, 2006, 2007, 2008, and 2009.

**WOC's Efforts to Correct the Government's Miscalculation of Rent Due**

57. After the government began underpaying the rent due, WOC repeatedly brought the underpayments to the government's attention. WOC described the underpayments to government officials in a telephone conference call and in letters.

58. For example, WOC described the underpayments to government officials in a January 15, 2002, conference call and to the government's Contracting Officer Robert Reed in letters dated April 8, 2002, May 14, 2002, and June 9, 2003.

59. WOC on December 20, 2002, filed a certified claim and requested Contracting Officer Robert Reed's final decision. Reed denied WOC's certified claim in a final decision on February 24, 2003.

**CLAIM FOR RELIEF**
**(Breach of Contract)**

60. Plaintiff incorporates herein paragraphs 1 to 59 of this Complaint by reference.

61. The government's underpayments of the rent due in years 2000, 2001, 2002, 2003, and 2004 constituted material breaches of the lease agreement.

62. As a direct and proximate result of such breach, plaintiff was damaged as follows:

A. $378,662.49 for the government's underpayments in the year beginning November 24, 2000;

B. $378,662.49 for the government's underpayments in the year beginning November 24, 2001;

C. $378,662.49 for the government's underpayments in the year beginning November 24, 2002; and

D. $94,665.62 for the government's underpayments, as of the date of this Complaint, in the year beginning November 24, 2003.

**WHEREFORE**, plaintiff requests that this Court:

A. enter a judgment holding that the government breached the lease agreement;

B. award plaintiff damages, including prejudgment interest;

C. award plaintiff such other and further relief as the Court deems just.

Respectfully submitted,

Robert P. Watkins

Robert P. Watkins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000

*Counsel for Plaintiff*

Dated: February 6, 2004

Of Counsel:

Charles Davant IV
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000
(202) 434-5029 (fax)